FILED
United States Court of Appeals
Tenth Circuit

March 10, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 12-3325

SCOTT FONSECA,

Defendant - Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:10-CR-20093-CM-1)**

---

Timothy C. Kingston, Law Office of Tim Kingston LLC, Cheyenne, Wyoming, for Defendant–Appellant.

James A. Brown, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff–Appellee.

---

Before **LUCERO**, **McKAY**, and **MATHESON**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Defendant Scott Fonseca was convicted of possessing stolen firearms in violation of 18 U.S.C. §§ 922(j) and 924(a)(2) and was sentenced to seventy months'

imprisonment.  On appeal, Defendant raises two challenges to his conviction.[1]  First, he

argues the district court erred in denying his motion to suppress evidence of the stolen

firearms because they were found as the result of a detention that exceeded the

permissible scope of a *Terry* stop.  Second, he contends reversible error occurred when

the government introduced testimony—contrary to the district court's grant of

Defendant's earlier motion in limine, but without a concurrent objection by

Defendant—that he had previously sold several guns that were stolen at the same time as

the eight firearms found as a result of the *Terry* stop.

## BACKGROUND

Defendant's girlfriend, Amanda White, testified at trial that she and Defendant

decided to burglarize a gun store in Springfield, Missouri, because they needed some

money to pay their bills.  A few days before the burglary, Defendant took his three- or

four-year-old son with him to case out a specific gun shop.  Then, early in the morning of

May 28, 2010, while Ms. White acted as the lookout and getaway driver, Defendant broke

into the store and stole thirty-six handguns.  A few hours later, Defendant and Ms. White

left Missouri and drove to Kansas City, Kansas, to sell the guns.  They stayed in Kansas

City for a few days and sold most of the stolen firearms, using the money to pay for their

hotel room and to buy food and illegal drugs.

---

[1] Defendant raised a third issue in his opening brief on appeal, but in his reply brief he conceded his argument was based on a mistaken factual premise.  He accordingly informed this court both in his reply brief and at oral argument he was electing not to pursue this issue on appeal.

At some point during the night of May 31 or the early morning of June 1, Defendant and Ms. White got into a disagreement after dropping the Defendant's son off with the child's mother. According to Ms. White, Defendant was upset because he thought Ms. White was "trying to take advantage of [the situation] and just get all the money and use it for drugs." (R. Vol. 2 at 291.) He was also angry because Ms. White had sold two of the guns for only $100 apiece and another gun was apparently missing. As a result of this argument, Defendant left the vehicle and walked off on his own, taking with him a black laptop bag that contained their remaining eight firearms. Ms. White drove away and spent the next few hours doing drugs with two individuals identified in the record as "Kaylin" and "C.J." Ms. White then received a phone call from Defendant, and she and the other two individuals left in her vehicle to go pick him up.

That same night, Officer Jason Reynolds was patrolling the 6100 block of Merriam Drive in Merriam, Kansas. This is an industrial area with no residences—"nothing but closed businesses down there late at night"—and as a result there had been a rash of auto burglaries at several car businesses in the area. (*Id.* at 348.) Officer Reynolds parked his patrol car and stood in a parking lot watching for suspicious activity. At approximately 2:45 am, Officer Reynolds saw Defendant walking past the parking lot, carrying a dark bag. Officer Reynolds told dispatch he was doing a pedestrian check, activated the body camera on his police vest, and walked towards Defendant. As he approached Defendant, Officer Reynolds shined his flashlight in Defendant's direction, identified himself as a police officer, and asked if he could speak with him. Defendant walked a little bit farther,

-3-

placed the black bag on the ground approximately twenty-five or thirty feet from Officer Reynolds, and walked back toward the officer. Officer Reynolds thought Defendant appeared to be trying to distance himself from the bag. Officer Reynolds also saw that Defendant was talking to someone on his cell phone and "seemed pretty emphatic about trying to get whoever was on the phone to come pick him up." (*Id.* at 20.) While Defendant was on the phone, Officer Reynolds asked if he could take a look at Defendant's identification, but Defendant stated he didn't have identification with him.

Defendant continued talking on the phone for the next few minutes until Ms. White's vehicle arrived, immediately followed by another police car. The two officers in this car—Officers Lewis and Sinelli—had set out for Officer Reynolds' location when he told dispatch he was doing a pedestrian check, and they noticed on their way that Ms. White's vehicle was heading in that direction too. After Defendant told Ms. White over the phone that attempting to speed off would just result in being pulled over, her car came to a stop near Defendant's location, and its occupants immediately exited. The other officers parked directly behind Ms. White's vehicle and began speaking with Kaylin and C.J., while Ms. White and Defendant had a short conversation. Officer Reynolds then asked Defendant to come back and talk to him, and he asked Ms. White to please return to the vicinity of her car. Ms. White testified at trial that while she was standing by her car and Defendant was standing by the officer, she observed Defendant "lip[] to [her], put the bag in the car." (*Id.* at 295.) She accordingly picked up the black bag from the ground where Defendant had left it and placed it in the back seat of her vehicle. Officer

Reynolds did not notice this interaction, and he continued questioning Defendant about what was going on that night.

In response to Officer Reynolds' questions, Defendant stated he was out walking in this neighborhood because his girlfriend had dropped him off earlier and then had a hard time locating him after he called for a ride. When Officer Reynolds pressed him for more details, Defendant stated that he was walking because Ms. White wanted to go hang out with her friend and he decided to walk instead. He stated: "We weren't arguing, fighting, nothing. She wanted to go hang out, I was going to go—walk—go this way, and that's what we did." (Supplemental R. Vol. I, Video Recording at 6:41–6:47.) While speaking with Defendant, Officer Reynolds asked Defendant several times if he could search him, but Defendant refused consent, and Officer Reynolds did not carry out a search. After a few minutes of conversation—approximately eight and a half minutes after Officer Reynolds first activated his body camera and initiated the stop—Defendant told the officer his name and birthdate but again said he did not have any identification on him.

Shortly thereafter, Officer Reynolds walked away from Defendant and noticed that the bag Defendant had been carrying earlier was no longer on the ground where Defendant had left it. Officer Reynolds asked Ms. White about the bag, and she told him she had placed it in the car. However, she falsely identified the bag she had placed in the car as a blue denim handbag that actually belonged to her friend Kaylin. Officer Reynolds brought the blue denim bag over to Defendant and asked if it was his, and

Defendant denied ownership, first stating that "it was just a bag that [he] was carrying for the girl" and then stating that he "d[id]n't know whose bag it is." (*Id.* at 12:10-12:35.) Kaylin indicated that this bag belonged to her, and Officer Reynolds obtained her consent to search it. Officer Reynolds spent a few minutes searching the blue denim bag and asking Kaylin about its contents, none of which were illegal. When he asked Kaylin why Defendant was carrying her bag, she paused and then replied, "I don't know." (*Id.* at 12:53–12:57.) After Officer Reynolds finished looking through the bag and speaking with Kaylin, at approximately sixteen and a half minutes after he first initiated the stop, Officer Reynolds asked Ms. White about Defendant's identity, and she provided him with the same name and birthdate Defendant had given. She stated that Defendant was walking because he had become angry and left the car after they had an argument earlier that night.

When he finished speaking with Ms. White, Officer Reynolds called dispatch to verify the name and birthdate Defendant had given him. Less than two minutes later, dispatch confirmed Defendant's identity and indicated Defendant had a current warrant out of Olathe, Kansas.[2] At this point, approximately twenty-one minutes had passed since Officer Reynolds first activated his body camera and initiated the stop. Officer Reynolds asked dispatch to obtain confirmation from the agency that issued the warrant and to send an additional backup officer. After confirmation had been obtained and the backup

---

[2] This turned out to be a bench warrant for non-payment of child support, although it does not appear that Officer Reynolds was aware of these details at the time.

officer had arrived, Defendant was placed in custody based on his outstanding warrant. Defendant's arrest occurred approximately thirty-one minutes after the initial contact occurred.

Following Defendant's arrest, Officer Lewis told Officer Reynolds that the bag Ms. White had placed in the car was a black computer bag, not the blue handbag she had earlier identified. Officer Lewis had noticed Ms. White placing the bag in the car earlier, but he did not do much to follow up on her actions at that time because he and Officer Sinelli—a new officer he was training that night—were busy "talking to the other two [individuals], one of whom was lying about who he was, kind of giving [the officers] some problems." (R. Vol. 2 at 440.) When Officer Reynolds confronted Ms. White with Officer Lewis' observations, Ms. White admitted she had lied about which bag Defendant was carrying, and she gave Officer Reynolds consent to search her vehicle. Upon walking over to the vehicle, Officer Reynolds saw the black computer bag sitting on the back seat of the car with the end of a handgun sticking out of the bag. He called Officer Lewis over, and Officer Lewis similarly observed two pistol grips sticking out of the bag's partially open side pocket. Officer Lewis searched the bag, finding eight firearms inside. The two firearms he had seen sticking out of the side pocket were loaded, and one of them had a bullet inside the chamber. The officers were able to trace all eight firearms back to the burglarized store in Missouri. The officers also found $2,035 in cash on Defendant's person when they searched him incident to his arrest.

Defendant was indicted in the United States District Court for the District of

-7-

Kansas on one count of possessing stolen firearms.  Defense counsel then filed a motion to suppress statements Defendant made to Officer Reynolds both during the initial encounter and after his arrest.  The district court held a suppression hearing at which it heard testimony from Officer Reynolds and viewed the video recording from Officer Reynolds' body camera.  The court granted the motion to suppress the statements Defendant made after he was handcuffed and taken into custody, but the court denied the motion as to the statements Defendant made prior to his arrest.  Defendant subsequently elected to represent himself, and he filed a pro se motion to suppress evidence of the guns themselves, arguing that the stop and search of the car was improper.  The district court held another suppression hearing at which it heard testimony from Ms. White.  At the end of this hearing, the court denied the pro se motion to suppress.

The case proceeded to trial, and the attorney who had been acting as standby counsel for Defendant stepped back in to represent him.  Just prior to the start of the trial, defense counsel made an oral motion in limine to exclude certain types of evidence, including evidence regarding "possible sales of guns to one or two, maybe more individuals.  In particular, there's an individual that has the nickname of Weezie." (*Id.* at 180-81.)  After hearing arguments from both sides, the court ruled:  "Regarding the sale of the guns that the government—defendant indicates the government may be trying to present, in regards to that, the court is going to find after consideration that as relates to the government's direct examination, defendant's oral motion in limine is granted." (*Id.* at 189.)  The court then warned defense counsel that the government was free to re-argue

-8-

this issue later if it believed a door was opened during cross-examination.

In his opening statement, defense counsel stated this case was not about Defendant, but instead was about Ms. White: "about a financially desperate young woman willing to do whatever it takes, including breaking the law, in order to make a quick buck." (*Id.* at 204.) Because "she was in desperate need of cash, . . . she came up with the idea of robbing a gun store" (*id.*) and "encouraged [Defendant] to engage in this conduct" (*id.* at 205). Defense counsel further stated that Ms. White would testify that she argued with Defendant after the burglary: "she's going to explain to you that during that argument, she was upset about money, among other things, and that she didn't feel like she was getting enough of the cash from these guns." (*Id.* at 206.)

During direct examination, the government asked Ms. White several questions about who was involved in the process of selling the stolen guns, how many guns were sold, and what happened with the proceeds of those sales. The government did not elicit any testimony about whom the guns were sold to. Defense counsel never objected to the government's questions about the gun sales. Rather, on cross-examination defense counsel himself asked a few questions alluding to the sale of guns, asking, for instance, whether Ms. White's disagreement with Defendant related in part to "how the proceeds were being distributed." (*Id.* at 321-22.)

The jury entered a guilty verdict against Defendant. Defendant then filed a motion for judgment of acquittal or for a new trial. Among other grounds, he argued the court erred in failing to suppress evidence of the eight stolen firearms. He also argued he had

raised the issue of reasonable suspicion in his pro se motion to suppress and it was not clear whether the court had ruled on this issue.

In a memorandum and order, the district court denied Defendant's motion for judgment of acquittal or for a new trial. In response to Defendant's argument about reasonable suspicion, the court stated it had implicitly found that Defendant's stop and detention were based on reasonable suspicion, and the court noted that it was arguable whether this issue was ever squarely before the court. The court then expressly held that it "heard more than ample evidence in the two suppression hearings to determine that Officer Reynolds did, in fact, have reasonable suspicion to stop and detain defendant." (R. Vol. 1 at 173.) The court further held that the scope of the detention was reasonable based on the totality of the circumstances, including the facts that (1) "defendant was carrying a bag, set it down, and then the bag was picked up by Ms. White"; (2) "defendant's answers to Officer Reynolds' questions were sketchy and suspicious"; and (3) "defendant's mannerisms and actions and the presence of Ms. White's car added to the suspiciousness of the situation." (*Id.* at 175.) The court held that its earlier mistake in "erroneously indicat[ing] that this issue had already been resolved on the record" did not entitle Defendant to a new trial, since "[t]he record is clear that Officer Reynolds had reasonable suspicion to stop and detain defendant." (*Id.*)

At sentencing, the government argued that a four-level gun-trafficking enhancement should be applied pursuant to U.S.S.G. § 2K2.1(b)(5) because Defendant sold some of the stolen firearms to Ronald Williams, a/k/a "Weezie," whom Defendant

knew to be a previously convicted felon. The district court denied this requested enhancement because Ms. White's testimony never mentioned any specific buyer of the firearms, much less identified Mr. Williams as a buyer. The court then imposed a guidelines-range sentence of seventy-months' imprisonment.

On appeal, Defendant challenges the denial of his motion to suppress evidence of the eight stolen firearms. He also argues his conviction must be reversed based on the introduction into evidence of testimony regarding his sale of the other stolen firearms.

## DISCUSSION

We first consider Defendant's challenge to the denial of his motion to suppress. "In reviewing a district court's ruling on a motion to suppress, this court accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party, the government in this case." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (internal quotation marks omitted). In our review of the evidence, "we are permitted to consider evidence introduced at the suppression hearing, as well as any evidence properly presented at trial." *Id.* (internal quotation marks and brackets omitted). "While the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a search or seizure under the Fourth Amendment is a question of law reviewed de novo." *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009) (internal quotation marks and citations omitted).

The parties appear to agree that Officer Reynolds' stop of Defendant in this case

-11-

was an investigative detention governed by the Supreme Court's opinion in *Terry v. Ohio*, 392 U.S. 1 (1968). A twofold inquiry determines whether a *Terry* stop is reasonable under the Fourth Amendment. "First, the officer's action must be 'justified at its inception.'" *United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993) (quoting *Terry*, 392 U.S. at 20). Thus, "[f]or an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity." *Id.* Second, the officer's actions must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 20). "There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather our evaluation is guided by common sense and ordinary human experience." *United States v. Albert*, 579 F.3d 1188, 1193 (10th Cir. 2009) (internal quotation marks omitted). "Moreover, we should not engage in 'unrealistic second-guessing' of a police officer's decision." *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

In this case, Defendant concedes that the first prong of *Terry* was satisfied—Officer Reynolds "could legitimately approach and question [Defendant] under *Terry*." (Appellant's Opening Br. at 23.) However, Defendant contends the detention was not reasonable in scope because Officer Reynolds continued to detain Defendant after he had answered the officer's questions and had told the officer his name and birthdate. By twelve minutes into the encounter, Defendant argues, Officer Reynolds had

-12-

exhausted all of his legitimate questions for Defendant, and Defendant's answers had not "yielded any incriminating information" that would justify further detention. (Appellant's Opening Br. at 25.) Defendant argues his continued detention after this point was unreasonable under the Fourth Amendment.

We hold that the scope of the detention was reasonable under all of the circumstances of this case. As an initial matter, we see nothing clearly erroneous in the district court's factual findings that Defendant's answers to Officer Reynolds' questions were "sketchy and suspicious" and that his "mannerisms and actions and the presence of Ms. White's car added to the suspiciousness of the situation." (R. Vol. 1 at 175.) Defendant argues the court erred in reaching these conclusions when Officer Reynolds did not explicitly characterize Defendant's answers or mannerisms as suspicious. However, the court viewed the video recording of the encounter and could permissibly make its own factual determinations regarding the suspiciousness of Defendant's actions and communications with the officer. After reviewing this recording and Officer Reynolds' testimony, we see no reason to overturn the court's factual findings.

Particularly in light of these findings, we conclude that it was not unreasonable for Officer Reynolds to continue to detain Defendant for the approximately ten minutes that passed after he finished questioning Defendant and before he learned of Defendant's current warrant. The detention was first prolonged by the officer's efforts to track down the bag Defendant had been carrying earlier. This conduct was reasonably related in scope to the goals of the stop. Officer Reynolds first observed Defendant carrying a bag

while walking alone in a high-crime industrial area in the middle of the night. After the

officer identified himself and asked to speak with Defendant, Defendant walked on a little

further and placed the bag on the ground before walking back toward the officer, and it

appeared to Officer Reynolds that Defendant was attempting to distance himself from the

bag. When the bag then disappeared from the ground where Defendant had left it, Officer

Reynolds reasonably decided to investigate where the bag had gone and what it might

contain. Contrary to Defendant's assertions, reasonable suspicion did not dissipate when

Defendant claimed he did not own the blue denim bag Ms. White falsely identified as the

bag Defendant had been carrying with him that night. It was quite reasonable for Officer

Reynolds to question why Defendant was supposedly carrying around his girlfriend's

friend's purse as he walked alone in the high-crime area at night, and neither Defendant's

nor Kaylin's responses to the officer's questions did anything to reduce the

suspiciousness of the situation. At this point, it was reasonable for Officer Reynolds to

spend a few minutes asking Ms. White about the events of that evening and about the

other individuals' identities. We are persuaded this conduct was reasonably related in

scope to the goals of the stop.

Then, in light of the overall suspiciousness of the situation, it was not unreasonable

for Officer Reynolds to spend a few more minutes verifying with dispatch that Defendant

was who he purported to be. In *United States v. Muldrow*, 19 F.3d 1332, 1336 (10th Cir.

1994), we held that the police were justified in detaining "a suspiciously acting man, who

said he carried no identification, near the scene of a burglary." We noted that "[t]he

detention lengthened because the Officer had to wait for the verification of Defendant's stated name and address," and we held that "[u]nder these facts, the detention was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (internal quotation marks omitted); *see also United States v. Trimble*, 986 F.2d 394, 398 (10th Cir. 1993) (holding that when a vehicle was stopped for having expired license plates and a passenger attempted to walk away after throwing something to the ground, the officer "was entitled to detain him for purposes of identification in order to ascertain 'what's going on'"). Similar reasoning applies here. Finally, once Officer Reynolds learned that Defendant had a current warrant out for his arrest, it was entirely reasonable for him to detain Defendant for a few more minutes while he confirmed the warrant information before finally placing Defendant under arrest.

After reviewing all of the evidence on appeal, particularly the video recording of the events leading up to Defendant's arrest, we are persuaded that "this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers." *Sharpe*, 470 U.S. at 687. We therefore affirm the district court's denial of Defendant's motion to suppress evidence of the eight stolen firearms. Because we affirm on this basis, we need not address the government's alternative arguments for affirming the suppression ruling.

We turn then to Defendant's argument regarding the introduction of evidence that he sold several of the stolen firearms before the night of his *Terry* stop. We first must resolve the question of the appropriate standard of review. In his opening brief,

Defendant suggested that a plain error standard of review might apply, given his failure to raise a contemporaneous objection when this evidence was introduced at trial. In response, the government stated it believes a more lenient standard of review is appropriate because Defendant's pretrial motion in limine was sufficient to preserve the issue for review under our holding in *United States v. Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993). Although both parties thus suggest a standard of review that is more favorable to the opposing side, we note that "the court, not the parties, must determine the standard of review, and therefore, it cannot be waived." *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001); *see also Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) (citing *Worth* and holding that the correct standard of review "is, unlike exhaustion, an unavoidable legal question we must ask, and answer, in every case"). After consideration, we conclude that Defendant did not preserve this issue for review and that plain error review is therefore appropriate.

The government argues that under *Mejia-Alarcon*, Defendant's challenge to the evidence of the gun sales was preserved for review when the district court unequivocally ruled on his motion to exclude this evidence. As the government points out, in *Mejia-Alarcon* we held that "a motion in limine may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge." 995 F.2d at 986. However, there is a crucial distinction between this case and *Mejia-Alarcon*. In *Mejia-Alarcon*, the objected-to evidence was admitted after the district court

unequivocally *denied* the motion in limine, while here the objected-to evidence was admitted after the district court unequivocally *granted* the motion in limine. Our holding in *Mejia-Alarcon* was premised on the notion that we should not require a party to futilely continue making objections at trial after the district court has unequivocally rejected that party's arguments. We reasoned: "When counsel diligently advances the contentions supporting a motion in limine and fully apprises the trial judge of the issue in an evidentiary hearing, application of the rule requiring parties to reraise objections at trial makes little sense." *Id.* (internal quotation marks, brackets, and ellipses omitted). "Moreover, requiring the renewal of objections after a definitive ruling may be a needless provocation to the trial judge, not to mention a distracting interruption during the trial." *Id.* However, this reasoning seems inapplicable where evidence is admitted in spite of, rather than in accordance with, a district court's ruling.

Common sense dictates against applying *Mejia-Alarcon*'s holding in such a dissimilar circumstance. If Defendant had raised a contemporaneous objection to the government's evidence of gun sales in this case, he would not have been futilely re-raising an objection that had already been rejected. Rather, he would have been putting the district court on notice of his current argument that the government was violating the court's earlier evidentiary ruling by eliciting testimony that fell within the scope of this ruling.[3] *See id.* (noting that "the question is whether an objection at trial would have been

---

[3] Although Defendant argues that "[t]he government failed its duty in this case" by introducing the gun sale evidence, he "does not hereby state that the government's error

-17-

more in the nature of a formal exception or in the nature of a timely objection calling the court's attention to a matter it need consider").  Our conclusion that *Mejia-Alarcon* does not apply in this case is supported by the Advisory Committee Note on the 2000 amendment to Rule 103 of the Federal Rules of Evidence, which states:

> Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered.  **If the court changes its initial ruling, or if the opposing party violates the terms of the initial ruling, objection must be made when the evidence is offered to preserve the claim of error for appeal.**  The error, if any, in such a situation occurs only when the evidence is offered and admitted.  *United States Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir. 1990) ("objection is required to preserve error when an opponent, or the court itself, violates a motion in limine that was granted"); *United States v. Roenigk*, 810 F.2d 809 (8th Cir. 1987) (claim of error was not preserved where the defendant failed to object at trial to secure the benefit of a favorable advance ruling).

Fed. R. Evid. 103 advisory committee's note (emphasis added).  In other words, where a ruling on a motion in limine is modified or violated, "[s]ince the error is not in granting or denying the motion in limine, but in admitting or excluding the evidence at trial, the motion in limine does not preserve this error."  21 Charles A. Wright & Kenneth W. Graham, *Federal Practice & Procedure* § 5037.16 (2d ed. 2005).

We accordingly reject the contention that the district court's unequivocal ruling in Defendant's favor preserved for review his current argument that this ruling was

---

or the Court's error was intentional or done purposefully to deprive him of his constitutional and legal rights" (Appellant's Opening Br. at 35), and he does not appear to be asserting any kind of prosecutorial misconduct claim.  Rather, he frames this issue as an evidentiary challenge.

subsequently violated. Rather, we hold that Defendant was required to raise a contemporaneous objection at the time the alleged error occurred—when the government introduced evidence that allegedly should have been excluded pursuant to the district court's pretrial ruling. Because Defendant did not object when this evidence was introduced, we will review his challenge to the introduction of this evidence only for plain error.

"Under plain error review, we will notice the alleged error and grant the appellant relief only when four requirements are met: (1) an error occurred; (2) the error is plain or obvious; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Pablo*, 696 F.3d 1280, 1287 (10th Cir. 2012). In this case, we conclude that Defendant's argument fails on the second prong of plain error review. We assume without deciding that an error occurred when, despite the district court's earlier ruling on the motion in limine, the government introduced evidence that Defendant sold several of the stolen guns between the time of the burglary and his arrest. However, we are not persuaded/ this error was plain or obvious. First, due to the manner in which the motion in limine was raised and then ruled upon, it is ambiguous whether the district court's ruling extended to all evidence that Defendant sold some of the stolen guns or whether it was instead limited to the anticipated testimony that Defendant sold the guns to specific unsavory individuals such as "Weezie." Second, while we do not here decide whether the nonspecific gun sale evidence should have been excluded, the answer to this question is not so clearly "yes"

that the introduction of this evidence was plainly or obviously improper. We accordingly conclude that the unobjected-to introduction of the nonspecific gun sale evidence was not a plain or obvious error.

Additionally, even if we were persuaded that Defendant had satisfied the first two prongs of plain error review, we would affirm his conviction based on the third prong—whether the error affected substantial rights. "Satisfying this third prong of plain-error review usually means that the error must have affected the outcome of the district court's proceedings." *Id.* at 1293 (internal quotation marks omitted). "The appellant bears the burden to make this showing. He must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id.* (internal quotation marks, brackets, and ellipses omitted). Defendant has not made such a showing in this case. Defendant contends that the sale of stolen guns is more serious than simple possession, and he suggests that his rights were prejudiced because the prejudicial weight of this evidence "would tend to override any other considerations the jury might have as to [Defendant's] guilt." (Appellant's Opening Br. at 34.) We are unpersuaded. The jury heard extensive, detailed testimony from Ms. White and other witnesses that Defendant burglarized a gun store and was in possession of several firearms stolen from this store when he encountered the police. The potential prejudice of the gun sale evidence was limited by the fact that Ms. White never mentioned who purchased the guns. Moreover, if the jury was not otherwise inclined to credit Ms. White's corroborated testimony about Defendant's burglary and possession of the stolen

firearms, it seems quite unlikely they would have believed her testimony that Defendant sold the stolen firearms and then convicted Defendant based on the limited prejudicial nature of this related testimony. Defendant has not met his burden of demonstrating a reasonable probability that the results of the trial would likely have been different if the jury had not heard Ms. White's testimony that she and Defendant sold some firearms to unidentified buyers. We accordingly conclude that this argument fails the third as well as the second prong of plain error review.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendant's conviction and sentence.