**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 13, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EDDIE JOE REZA,

    Defendant - Appellant.

_____

Nos. 23-2049
(D.C. No. 2:10-CR-02135-RB-1)
(D.N.M.)

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EDDIE JOE REZA,

    Defendant - Appellant.

No. 23-2050
(D.C. No. 5:21-CR-01042-RB-1)
(D.N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **EID**, Circuit Judges.
_____

On July 17, 2020, a known source informed law enforcement that Appellant

Eddie Joe Reza, a known felon, was in possession of firearms and fentanyl pills and

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

driving a specific vehicle in a particular area of Carlsbad, New Mexico. Within a few hours, an officer in the identified area spotted the vehicle and initiated a traffic stop because the vehicle's registration was expired. Mr. Reza was the driver. When officers searched the vehicle, they found firearms and fentanyl pills.

Mr. Reza was arrested and charged with being a felon in possession of firearms and ammunition. Prior to trial, Mr. Reza moved to suppress the evidence from the search. The district court denied his motion, concluding the search was justified under the automobile exception to the warrant requirement. Mr. Reza entered a conditional guilty plea, reserving his right to appeal the denial of his suppression motion. Mr. Reza challenges that ruling on appeal. Concluding there was probable cause to believe Mr. Reza was in possession of contraband at the time of the search, we affirm.

## I.      BACKGROUND

### A.      *Factual History*[1]

Between 8:00 and 10:00 p.m. on July 17, 2020, Carlsbad Police Department ("CPD") Detective Chad Herrera received an unsolicited phone call about Mr. Reza. The call was from a "source of information," a term used to describe citizens who provide law enforcement with tips about suspicious activities. The source advised

---

[1] When reviewing a district court's ruling on a motion to suppress, we accept "the district court's factual findings unless clearly erroneous and view[] the evidence in the light most favorable to the prevailing party," in this case the Government. *United States v. Fonseca*, 744 F.3d 674, 680 (10th Cir. 2014) (quotation marks omitted).

Detective Herrera that Mr. Reza was driving around the Lea Street area of Carlsbad with firearms and fentanyl pills. The source had seen Mr. Reza with the firearms and fentanyl on July 16, the day before the call. The source also stated Mr. Reza was driving a white Nissan SUV with chrome rims.

Detective Herrera was familiar with Mr. Reza because he had previously interviewed him as part of a burglary investigation. During that investigation, Detective Herrera's coworkers informed him that Mr. Reza was known to possess firearms and exhibit violent tendencies toward law enforcement. Detective Herrera was also familiar with the identified vehicle—it belonged to Mr. Reza's mother, and Mr. Reza was known to drive it.

Detective Herrera knew the source's identity and determined the information was credible.[2] The source had provided Detective Herrera with valid information the month before, leading to the arrest of a felon in possession of a firearm. Additionally, Detective Herrera had never known the source to provide false information. And, to Detective Herrera's knowledge, the source was not facing criminal charges and did not receive payment or other special treatment for providing information. However, Detective Herrera did not know if the source had a criminal history.

---

[2] Mr. Reza incorrectly refers to the source as "anonymous." Appellant's Br. at 11. At oral argument, he clarified that by "anonymous," he means the source's identity is unknown to him, even if known to the officers. He further clarified he is not arguing the district court clearly erred by finding that Detective Herrera knew the source's identity.

Immediately after speaking with the source, Detective Herrera passed the tip along to Sergeant John Sneathen, a CPD supervisor assigned to the Pecos Valley Drug Task Force ("Drug Task Force"). Sergeant Sneathen knew the source's identity and considered the information "significant." ROA Vol. I at 121.[3] He also knew Mr. Reza drove a white Nissan SUV with chrome rims and had been involved in a "large-scale shoot-out" several years earlier with law enforcement. *Id.*

The source's tip corroborated other information Sergeant Sneathen had received about Mr. Reza. Over the past three months, the Drug Task Force had received anonymous "Crime Stoppers tips" that Mr. Reza was selling fentanyl. *Id.* at 122. Sergeant Sneathen had also received information from a different confidential source who personally told him Mr. Reza was selling fentanyl in Carlsbad.[4] That confidential source, who was known to Sergeant Sneathen, reported seeing Mr. Reza in possession of fentanyl and explained that Mr. Reza was known in the area's drug culture as a source for purchasing fentanyl pills. Sergeant Sneathen believed this information was reliable because the confidential source had previously provided

---

[3] The record on appeal in this matter is split between two case numbers which have been consolidated for appeal: 23-2050 contains the record pertaining to Mr. Reza's indictment and conviction for being a felon in possession of a firearm and ammunition, including the relevant motion to suppress; and 23-2049 contains the record pertaining to Mr. Reza's revocation of supervised release, based on the same charged conduct. All record citations are to the record in case number 23-2050.

[4] We describe this source as a "confidential source" because that is the term Sergeant Sneathen used. But this source and the source who provided the July 17, 2020 tip were known to officers.

information and purchased narcotics for the Drug Task Force. Furthermore, Sergeant Sneathen knew of no reason to doubt the confidential source's information.

Sergeant Sneathen relayed the information provided by Detective Herrera to the on-call Drug Task Force Agent, Devon Stinson. Agent Stinson knew Mr. Reza drove a white Nissan SUV with chrome rims and was familiar with his history of violence and the reports of drug trafficking. Agent Stinson, in turn, contacted the CPD on-duty supervisor, Sergeant Adrian Rodriguez. Agent Stinson relayed the source's report that Mr. Reza was in the area and possessed firearms and fentanyl, and also provided a photograph of Mr. Reza's vehicle.

During pre-shift briefing, Sergeant Rodriguez shared the information and photograph with his graveyard-shift officers, including Officer Israel Rodriguez. Sergeant Rodriguez told them to be on the lookout for Mr. Reza, who was driving a white SUV and possibly dealing fentanyl pills and in possession of firearms. Sergeant Rodriguez also provided the officers with the SUV's license plate number.

Around 11:00 p.m. that night, a CPD officer communicated over the radio that Mr. Reza's white Nissan was parked at a convenience store. Officer Rodriguez responded by parking his patrol car a block from the store, near the intersection of Texas Street and Fifth Street. This intersection was about half a mile, or several blocks, from Lea Street, where the source had said Mr. Reza would be.

Mr. Reza's Nissan began traveling eastbound on Texas Street, toward the intersection with Fifth Street. Officer Rodriguez pulled out behind the Nissan, ran the license plate over the radio, and was informed by dispatch that the vehicle's

registration had expired. The Nissan then turned on North Fifth Street, with Officer Rodriguez following. Officer Rodriguez knew the area of North Fifth Street, and the nearby Colonial Hillcrest Apartments, to be a high crime area. Specially, he was aware of homicides, shoot-outs, and burglaries that had occurred there, and he had personally arrested several people for felony warrants in the apartments. North Fifth Street is a two-lane, residential road, with several dirt areas where cars can pull off the road.

About forty-five seconds after pulling behind the Nissan, Officer Rodriguez engaged his emergency overhead lights to initiate a traffic stop. Rather than pulling over, the Nissan continued on North Fifth Street, passing several dirt areas where it could have safely pulled over. There were no other vehicles on the road, and nothing obstructed the driver's view of Officer Rodriguez's lights. The driver's failure to promptly pull over was significant to Officer Rodriguez because in his experience, drivers typically pull over as soon as they see an officer's emergency overhead lights and it is safe to pull over. Also in his experience, drivers who do not stop are calling someone, preparing to jump out of the car, or planning to flee the traffic stop. When the Nissan still did not pull over, Officer Rodriguez honked his "Rumbler"—a device that makes noise and shakes the ground to get the attention of distracted drivers— twice in an attempt to get the vehicle to stop. *Id.* at 168.

After traveling about 300 meters from where Officer Rodriguez had first engaged his emergency lights, the Nissan turned into a parking area of the Colonial Hillcrest Apartments and came to a stop partly in a parking spot. Officer Rodriguez

6

parked behind the Nissan and was soon joined by three other officers. From his patrol car, Officer Rodriguez saw the Nissan's driver inexplicably roll the passenger-side window down, then roll it back up. Officer Rodriguez testified that his "alert levels were a little bit up" based on his knowledge of CPD's previous encounters with Mr. Reza, Mr. Reza's flag as "armed and dangerous" in CPD's system, and information from Sergeant Rodriguez that Mr. Reza might be armed. *Id.* at 167.

Once Officer Rodriguez saw the driver roll the window back up, he exited his patrol car and approached the driver's side window. He asked the driver for his license, registration, and proof of insurance. The driver provided his license, and Officer Rodriguez identified him as Mr. Reza. Officer Rodriguez noticed the address listed on the driver's license was not near the area of the traffic stop. After providing his license, Mr. Reza explained the Nissan was his mother's, he was unaware the registration had expired, and he could not find proof of insurance. Officer Rodriguez asked Mr. Reza to call his mother to ask if she could provide proof of insurance. Mr. Reza called his mother but was unable to provide proof of insurance after speaking with her for several minutes.

Officer Rodriguez testified that had Mr. Reza been able to provide proof of insurance, he would have cited Mr. Reza for the expired registration, but he would have been free to leave. Because Mr. Reza could not provide proof of insurance, Officer Rodriguez—based on his understanding of CPD policy—decided to cite Mr. Reza for the expired registration, issue a warning for the lack of insurance, and have the Nissan towed. Officer Rodriguez completed the citations and asked

7

Mr. Reza to exit the vehicle and approach his patrol car. Officer Rodriguez explained the citations, and Mr. Reza signed them. Officer Rodriguez told Mr. Reza the Nissan would be towed and asked him if he needed anything from the vehicle. Mr. Reza asked for his wallet and house keys.

Officer Rodriguez retrieved a wallet from the Nissan and looked through its contents to establish it was Mr. Reza's and to verify it did not contain weapons or contraband. Officer Rodriguez did not have a warrant or Mr. Reza's consent to search the wallet, but he believed he could search items to be sure he was not returning weapons or contraband to Mr. Reza.

Officer Rodriguez also retrieved Mr. Reza's key chain from the car and brought it to him so he could remove his house keys. A coin pouch was attached to the chain, and as Officer Rodriguez was walking to Mr. Reza, he felt the outside of the pouch. Based on his training and experience, the pouch contained pills that felt like fentanyl pills. Officer Rodriguez opened the pouch and saw different colored pills that, based on his training and experience, were consistent with contraband. Officer Rodriguez did not have a search warrant for the coin pouch, nor did he have Mr. Reza's consent, but he believed he was authorized to look in the pouch as part of an inventory search.

At that point, Officer Rodriguez advised Mr. Reza of his *Miranda* rights and asked him about the pills. Mr. Reza declined to answer questions about the pills, and Officer Rodriguez placed him under arrest for possession of a controlled substance. Officer Rodriguez handcuffed Mr. Reza, sat him in the back seat of his patrol car,

8

and continued searching the Nissan. He searched the driver-side area while another officer searched the passenger side. The officer searching the passenger side found a black handgun in the back pocket of the passenger seat.

Upon finding the handgun and in accordance with CPD policy, the officers stopped their search and contacted Sergeant Sneathen. Sergeant Sneathen instructed Officer Rodriguez to stop everything, seal the vehicle, and wait for a search warrant. Officer Rodriguez sealed the vehicle and, after Sergeant Sneathen and Agent Stinson arrived to take over the investigation, transported Mr. Reza to the CPD.

After obtaining a search warrant, Sergeant Sneathen and Agent Stinson searched the Nissan. They found a loaded Taurus nine-millimeter handgun in the back pocket of the front passenger seat, a Smith & Wesson .40 caliber handgun inside a duffel bag on the backseat, a large quantity of ammunition matching both firearms, also inside the duffel bag, and several pills which later tested positive for fentanyl.

### B.    Procedural History

At the time of his arrest, Mr. Reza was a convicted felon on supervised release. Accordingly, Mr. Reza was indicted on one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924. Because Mr. Reza was on supervised release, this charge led to two separate proceedings: prosecution of the charge itself and revocation of Mr. Reza's supervised release.

Mr. Reza moved to suppress all evidence obtained from the July 2020 traffic stop. He argued the search of his vehicle was not supported by probable cause and was not justified as an inventory search. In response, the Government argued there

was probable cause, but it did not contend the "decision to impound and inventory the Nissan" justified the search. ROA Vol. I at 67 n.1.

At the ensuing evidentiary hearing, the district court heard testimony from Detective Herrera, Sergeant Sneathen, Agent Stinson, and Officer Rodriguez. The Government also presented Officer Rodriguez's dash-camera footage, his body-worn-camera footage, and photographs taken during the vehicle search. Following the hearing and the parties' submission of their proposed findings of fact and conclusions of law, the district court denied Mr. Reza's Motion to Suppress. The court concluded that the search of Mr. Reza's vehicle was supported by probable cause and acknowledged that the Government did not argue the search was justified as an inventory search. The court further explained that Officer Rodriguez's subjective intent was irrelevant to its analysis.

Following the court's denial of his Motion to Suppress, Mr. Reza pleaded guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), reserving his right to appeal the denial of the Motion to Suppress. The district court entered judgment, and Mr. Reza timely appealed.

## II.    DISCUSSION

Mr. Reza argues the district court erred in concluding there was probable cause to search his vehicle. He also argues the search was unlawful because Officer

Rodriguez subjectively (and incorrectly) believed it was an inventory search. Finally, he contends Officer Rodriguez unlawfully extended the stop.

We first outline the standard of review and the applicable Fourth Amendment law. Next, we assess each of Mr. Reza's arguments, concluding that none demonstrate error in the district court's ruling.

### A.     Standard of Review

"When reviewing a district court's denial of a motion to suppress, we will consider the totality of the circumstances and view the evidence in a light most favorable to the government." *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004). We accept the district court's factual findings unless they are clearly erroneous. *Id.* Factual findings are clearly erroneous only "if they are without factual support in the record" or if, "after reviewing the evidence, [we are] firmly convinced that a mistake has been made." *Leathers v. Leathers*, 856 F.3d 729, 762 (10th Cir. 2017) (internal quotation marks omitted). We defer to the district court on witness credibility, the weight to be given evidence, and the reasonable inferences to draw from the evidence. *Kimoana*, 383 F.3d at 1220. But "[t]he ultimate determination of reasonableness under the Fourth Amendment is a question of law [we] review[] de novo." *Id.*

### B.     Fourth Amendment Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are presumptively unreasonable, but

11

there are exceptions. *Birchfield v. North Dakota*, 579 U.S. 438, 456 (2016). Under the "automobile exception," "a warrantless search is permissible if there is probable cause to believe that the vehicle contains contraband." *United States v. Edwards*, 632 F.3d 633, 645 (10th Cir. 2001). If probable cause exists, law enforcement may lawfully "search any package within the vehicle that is capable of concealing" contraband. *Id.*

When assessing probable cause, we consider the totality of the circumstances, rather than viewing facts in isolation. *United States v. Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006). "Even where a particular factor, considered in isolation, is of limited significance and must be discount[ed], it nonetheless may affect the Fourth Amendment analysis when combined with other indicia of probable cause or reasonable suspicion." *Id.* (alteration in original) (internal quotation marks omitted).

The government bears the burden of showing probable cause existed when the search occurred. *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021). If the government does not carry its burden, then the unlawfully obtained evidence must be excluded from trial. *Utah v. Strieff*, 579 U.S. 232, 237 (2016). The exclusionary rule applies both to "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of illegality." *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

### C.    *Probable Cause*

After considering all relevant facts, the district court concluded "there was probable cause to search [Mr.] Reza's vehicle for contraband." ROA Vol. I at 267.

12

Mr. Reza argues the court erred in its analysis. Below, we review the facts considered by the district court, first individually and then collectively. Considering the totality of the circumstances, we conclude there was probable cause to believe Mr. Reza was in possession of contraband at the time of the search.

**1.      The July 17, 2020 Tip**

When deciding whether a tip supports probable cause, we consider all relevant factors, "including the informant's veracity, reliability, and basis of knowledge." *United States v. Hendrix*, 664 F.3d 1334, 1338 (10th Cir. 2011). These factors are intertwined and "not absolute, independent requirements that must be satisfied in order for probable cause to exist." *Id.* (quotation marks omitted). Thus, a "deficiency in one factor may be compensated for by a strong showing of another or by other indicia of reliability." *Id.* (quotation marks omitted).

"Veracity concerns whether there is reason to believe that the informant is telling the truth, including whether he faces criminal charges or whether his statement is against his own penal interest." *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009); *see also Illinois v. Gates*, 462 U.S. 213, 233–34 (1983) ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary.").

Here, Detective Herrera's source was not facing criminal charges and did not receive special treatment or payment for providing the information. This

demonstrates the source's veracity. *See Quezada-Enriquez*, 567 F.3d at 1233; *Gates*, 462 U.S. at 233–34 (discussing the veracity of citizen-informants).

The next factor, reliability, inquires "whether the informant has provided accurate information in the past." *Quezada-Enriquez*, 567 F.3d at 1233. Additionally, the fact that an informant's identity was known to law enforcement at the time of the statements indicates both reliability and veracity. *United States v. Pulliam*, 748 F.3d 967, 971 & n.2 (10th Cir. 2014); *cf. United States v. Johnson*, 364 F.3d 1185, 1190 (10th Cir. 2004) ("A tipster who refuses to identify himself may simply be making up the story, perhaps trying to use the police to harass another citizen.").

In this case, the source historically provided accurate information, thus indicating reliability. *See Quezada-Enriquez*, 567 F.3d at 1233. Detective Herrera received information from the same source the previous month, who had proved accurate and led to the arrest of a felon in possession of a firearm. Detective Herrera further testified he had never known the source to provide false information. Additionally, he and Sergeant Sneathen knew the source's identity. This indicates both reliability and veracity. *Pulliam*, 748 F.3d at 971 & n.2; *see also Florida v. J.L.*, 529 U.S. 266, 270 (2000) (contrasting an anonymous tip with one from "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated").

With the third factor, basis of knowledge, an informant's tip is entitled to greater weight if it is based on firsthand observation rather than secondhand information. *Quezada-Enriquez*, 567 F.3d at 1233. When an informant's basis of

14

knowledge is not apparent, we ask whether the tip included "the kind of highly specific or personal details from which one could reasonably infer that the [informant] had firsthand knowledge about the claimed criminal activity" or whether the informant provided accurate predictive information that was confirmed by law enforcement observation. *Id.* (alteration in original) (quotation marks omitted); *see also J.L.*, 529 U.S. at 271 (discussing accurate predictive information as an indicia of reliability).

The source's information here was based at least in part on firsthand observation. While the source did not explain the basis for knowing Mr. Reza would be in the Lea Street area that night, the source had personally observed Mr. Reza in possession of firearms and fentanyl the day before. Thus, the source's information is entitled to greater weight to the extent it was based on recent, firsthand knowledge of Mr. Reza's criminal activity.[5] *See Quezada-Enriquez*, 567 F.3d at 1233.

---

[5] The Government argues the source's information that Mr. Reza would be driving a white Nissan SUV with chrome rims in the vicinity of Lea Street was directly corroborated by law enforcement observation, lending additional credibility to the source. Accurate predictive information, even regarding banal activity, may lend credibility to a source's knowledge and assertions. *See Florida v. J.L.*, 529 U.S. 266, 270–71 (2000) (discussing *Alabama v. White*, 496 U.S. 325, 332 (1990), wherein an anonymous tip gave rise to reasonable suspicion that a woman was carrying contraband only after observation confirmed the informant had accurately predicted the woman's movements). But while "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, [it] does not necessarily imply that the informant knows . . . whether that person is [engaged in criminal activity]." *Id.* at 271. A tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. Thus, while law enforcement observation confirmed the source provided accurate predictive information regarding Mr. Reza's whereabouts and the appearance of his car, we

For these reasons, the veracity, reliability, and basis of knowledge for the July 17, 2020 tip all support probable cause. But here we need not conclude that tip alone established probable cause.

**2.    Corroborating Tips**

Additional tips can further corroborate a source's information, particularly if they are from an independent source, and even if they are anonymous. *United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004); *see also United States v. Sturmoski*, 971 F.2d 452, 457 (10th Cir. 1992) (discussing the independent information corroborating a tip).

Here, there were two sources corroborating the July 17, 2020 tip. First, the Drug Task Force had received anonymous "Crime Stoppers tips" that Mr. Reza was selling fentanyl in Carlsbad. ROA Vol. I at 122. Additionally, an identified confidential source personally told Sergeant Sneathen that Mr. Reza was selling fentanyl and was a known source for purchasing pills. These tips came in the months leading up to Mr. Reza's arrest and further corroborated the July 17, 2020 tip.

Nevertheless, Mr. Reza faults the Government for not providing more information about these corroborating sources. While the record does not contain details of the veracity, reliability, or basis of knowledge for the anonymous "Crime Stoppers tips," Sergeant Sneathen provided more information about his corroborating

---

accord less weight to the corroboration of "innocent, innocuous information." *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009).

source. For example, the confidential source had previously provided him with truthful information and had purchased narcotics for the Drug Task Force. The confidential source had also seen Mr. Reza in possession of fentanyl and heard, through word-of-mouth in the area's drug culture, that Mr. Reza was a known source for purchasing pills. Thus, the information was based at least partially on firsthand knowledge and came from a source who was not anonymous and had provided accurate information in the past. These factors all weigh in favor of the veracity, reliability, and knowledge basis for the corroborating confidential source's information. *See Quezada-Enriquez*, 567 F.3d at 1233.

In sum, the confidential source's information and the anonymous Crime Stopper's tips helped corroborate the July 17, 2020 tip and support probable cause. *See Artez*, 389 F.3d at 1114.

### 3.    Known Criminal History

An individual's "prior criminal history is by itself insufficient to create [even] reasonable suspicion." *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005). "[P]eople with prior convictions retain Fourth Amendment rights" and "are not roving targets for warrantless searches." *Id.* But a person's criminal history, when considered alongside other factors, may contribute to our analysis and "cast a suspicious light on other seemingly innocent behavior." *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) (quotation marks omitted); *see also Santos*, 403

17

F.3d at 1132 ("But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus.").

When Officer Rodriguez pulled Mr. Reza over, his criminal history was well known to CPD officers, including Officer Rodriguez. Multiple officers testified to Mr. Reza's history of violence toward law enforcement, in particular his involvement in a shoot-out with CPD officers. Officer Rodriguez testified that he was aware of Mr. Reza's previous violent encounters with CPD officers and that Mr. Reza was "flagged as armed and dangerous" in CPD's system. ROA Vol. I at 167.

While Mr. Reza's known criminal history would not support probable cause on its own, it is another factor to be considered in the probable cause calculus.

**4.     Failure to Promptly Yield**

There may be a reasonable explanation for a person's failure to immediately stop when an officer activates emergency lights, but "it [is] also reasonable for [an officer] to interpret the action as potentially indicative of criminal activity." *See Courtney v. Oklahoma ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1224 (10th Cir. 2013).

Officer Rodriguez testified that, in his experience, drivers ordinarily pull over immediately when signaled to do so and that a failure to promptly yield may indicate a person is calling someone or about to flee. He also testified that after he engaged his emergency lights, Mr. Reza drove past multiple safe areas to pull over, and Officer Rodriguez could see no reason for Mr. Reza's failure to promptly yield.

Indeed, it was only after Officer Rodriguez twice activated his Rumbler that Mr. Reza stopped.

While there may be an innocent explanation for Mr. Reza's actions, in our totality of the circumstances analysis "[w]e give deference to an officer's ability to distinguish between innocent and suspicious actions." *United States v. Lyons*, 510 F.3d 1225, 1237 (10th Cir. 2007) (internal quotation marks omitted). Accordingly, Mr. Reza's failure to pull over promptly when Officer Rodriguez engaged his emergency lights supports probable cause.

**5.     High Crime Area**

A person's presence in a high crime area is not by itself sufficient to support even a reasonable suspicion of criminal activity, let alone probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* Accordingly, the fact that the stop occurred in a high crime area is a contextual consideration relevant to our analysis. *See id.*; *United States v. Charles*, 576 F.3d 1060, 1065 (10th Cir. 2009) ("It is also a relevant consideration, though not necessarily dispositive, that the officers . . . encountered [the defendant] late at night[] and in a high-crime area.").

The Government contends Mr. Reza's "presence in a notoriously high-crime area late at night," while not enough alone to justify a search, is a relevant consideration. Appellee's Br. at 18. Mr. Reza replies that there are no facts in the record to support the assertion that the traffic stop occurred in a high crime area. But

19

the district court's finding that Mr. Reza drove toward an area "known for its high rate of violent crime" was supported by Officer Rodriguez's testimony. ROA Vol. I at 264. Officer Rodriguez testified that he knew the area to be a high crime area because he was aware of homicides, shoot-outs, and burglaries that had occurred there and had personally executed several felony arrest warrants at the Colonial Hillcrest Apartments. Thus, the district court's factual finding was not clearly erroneous. *See Fonseca*, 744 F.3d at 680.

While not dispositive, Mr. Reza's nighttime presence in a high crime area weighs in favor of probable cause.

## 6.    Totality of the Circumstances

Having separately examined the factors considered by the district court, we proceed to evaluate them collectively, giving due weight to the district court's reasonable inferences. *See Santos*, 403 F.3d at 1133. We conclude the district could did not err when it determined probable cause existed at the time of the search.

When the search occurred, Officer Rodriguez knew the Drug Task Force had received credible information that Mr. Reza was driving the white Nissan while in possession of fentanyl and firearms.[6] This information came from a known source

---

[6] The district court noted Mr. Reza had not argued Officer Rodriguez was unaware of the information and, regardless, the information could be ascribed to Officer Rodriguez "under the 'collective-knowledge doctrine,' in which 'the knowledge of one officer supporting a search or seizure may be imputed to other enforcement officers acting in conjunction with the knowledgeable officer.'" ROA Vol. I at 263 n.7 (quoting *James v. Chavez*, 830 F. Supp. 2d 1208, 1260 (D.N.M. 2011)). Mr. Reza has not challenged this conclusion on appeal or argued Officer Rodriguez was unaware of the pertinent information.

who had previously provided accurate information and was based on the source's firsthand observation of Mr. Reza the day before. It was further corroborated by at least two other tips that Mr. Reza was selling fentanyl, one of which was provided by a known source. That known source had previously provided accurate information and had firsthand knowledge of Mr. Reza's fentanyl possession. Officer Rodriguez was further aware of Mr. Reza's criminal history and past violence toward law enforcement. Moreover, as Officer Rodriguez personally observed, Mr. Reza did not promptly respond to emergency lights and instead continued driving before eventually pulling over in an area Officer Rodriguez knew to have a high incidence of violent crime.

Some of these factors, such as Mr. Reza's presence in a high crime area, criminal history, and failure to promptly pull over, "do not weigh very heavily in the calculus," but they still "must be taken into consideration." *Id.* "[A]s the Supreme Court has admonished, it would be legal error to employ a divide-and-conquer strategy." *Id.* Instead, we ask whether the facts combined to create probable cause to believe the vehicle contained contraband. *See Edwards*, 632 F.3d at 645.

Viewed in totality, the facts known when the search occurred created probable cause to believe the vehicle contained firearms or fentanyl. Mr. Reza has thus not shown the district court erred when it denied his Motion to Suppress.

### D.    *Subjective Intent*

Mr. Reza also argues the search was unlawful because Officer Rodriguez subjectively believed probable cause did not exist but nonetheless proceeded "under

21

the guise of an inventory search." Appellant's Br. at 12–13. We decline to reverse on this ground, however, because Officer Rodriguez's subjective intent is irrelevant.

"Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). Rather than assessing subjective intent, "[w]e ask whether 'the circumstances, viewed objectively, justify [the challenged] action.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (second alteration in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). If a reasonable officer considering the totality of the circumstances could objectively believe probable cause existed, then the Fourth Amendment is satisfied, "*whatever* the subjective intent" of the officer. *Whren*, 517 U.S. at 814.

As explained, probable cause objectively existed at the time officers searched Mr. Reza's vehicle. It is thus irrelevant whether Officer Rodriguez (or any other officer) subjectively believed probable cause existed. *See id.* at 813. It is also irrelevant whether this was a valid inventory search because, regardless, there was probable cause. *See Edwards*, 632 F.3d at 645 ("Accordingly, despite the fact that this was not a valid search incident to arrest and not an inventory search, the search may nevertheless be justified if we find that it was supported by probable cause.").

Mr. Reza also argues that the officers' failure to seek a warrant before the search suggests probable cause did not exist. But whether the officers could have applied for a warrant is immaterial. The relevant inquiry is whether an exception to the warrant requirement existed. And here, under the automobile exception, a warrant

was not required because Officer Rodriguez had probable cause to believe the vehicle contained contraband.

For these reasons, we do not consider the officers' subjective beliefs about the search.

### E.    Length of the Stop

Lastly, Mr. Reza contends that although the stop was lawful at its inception, it became unlawful when it lasted longer than necessary to effectuate its purpose. The Government responds that Mr. Reza waived this argument by not raising it before the district court. We agree with the Government and do not consider Mr. Reza's waived argument.

"When a defendant fails to raise a particular suppression argument in district court, the argument is waived absent a showing of good cause." *United States v. Anderson*, 62 F.4th 1260, 1265 (10th Cir. 2023); *see also* Fed. R. Crim. P. 12(c)(3). "Failure to show good cause precludes even plain error review." *Anderson*, 62 F.4th at 1265.

Before the district court, Mr. Reza did not argue that Officer Rodriguez unlawfully extended the stop longer than necessary. And on appeal, he has not argued good cause for failing to present the argument earlier. Rather, he responds to the Government's waiver argument by stating his "contention has been that the impoundment of the vehicle and subsequent search was unconstitutional." Reply at 3. But an argument that the search was unconstitutional is distinct from an argument that the stop became illegal because its purpose was accomplished. Thus, Mr. Reza

23

waived any argument about the length of the stop, and we may not consider it for the first time on appeal.

### III.     CONCLUSION

Mr. Reza has not shown any error in the district court's probable cause analysis. We thus AFFIRM the district court's denial of Mr. Reza's Motion to Suppress.

Entered for the Court


Carolyn B. McHugh
Circuit Judge