FILED
United States Court of Appeals
Tenth Circuit

April 23, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 07-4141

TAMARA YVONNE JONES,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:05-CR-534-TS)**

Scott K. Wilson, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Salt Lake City, Utah.

Stephen J. Sorenson, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with him on the brief), Office of the United States Attorney, Salt Lake City, Utah.

Before **O'BRIEN**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

The question in this case presents a variation on when a police encounter evolves into a custodial interrogation, requiring officers to issue a warning under

*Miranda v. Arizona*, 384 U.S. 436 (1966).  Tamara Yvonne Jones challenges

statements she made to a federal officer, Agent Jeff Bridge, who interrogated her

in connection with her recent purchase of iodine crystals, a chemical used in

methamphetamine production.  During the encounter, Jones explained she had

ordered the iodine hoping to resell it to another person who would use it to

produce drugs.  On the basis of her statements to Bridge, Jones was later charged

with possessing iodine knowing it would be used to manufacture

methamphetamine, a violation of 21 U.S.C. §§ 841(c) and 846.

Before trial, Jones moved to suppress the statements given without a

*Miranda* warning.  The district court denied the motion.  Because Jones was not

in custody when she spoke with Bridge inside his unmarked patrol car, we

conclude *Miranda* does not apply.

We therefore AFFIRM the district court's denial of the motion to suppress.

## I.  Background

Agent Bridge testified at the suppression hearing and at trial about the

circumstances surrounding his encounter with Jones.  We construe all facts in the

light most favorable to the prevailing party, in this case the government.  *United

States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000).

*The Initial Investigation*

On March 16, 2005, customs agents in Buffalo, New York, intercepted a

FedEx package containing iodine crystals.  The agents were concerned the

chemicals were intended for either explosives or methamphetamine manufacture, since iodine is a precursor chemical in cooking methamphetamine. Because the package was addressed to Jones in Sandy, Utah, the Buffalo office contacted Agent Bridge, stationed in Utah, to conduct further investigation.

Bridge checked Jones's criminal history, which revealed recent drug arrests involving methamphetamine. Assisted by other customs agents, Bridge attempted to deliver the iodine to Jones's address listed on the package but failed, as Jones had apparently moved. From local court records, Bridge determined Jones had a court hearing in Salt Lake City on an unrelated matter scheduled for the afternoon of April 7, 2005. He decided to attend the hearing and try to speak with Jones about the package.

Unable to speak with Jones in the courthouse, Bridge and one other agent followed Jones and her companion in their car. Two other agents, in another car, joined them. Both cars were unmarked, and all four agents were in plain clothes.

*Gas Station Encounter*

After dropping off her companion at a nearby business, Jones pulled into a gas station at the intersection of two major streets. She parked by a gas pump and went into a convenience store. The agents pulled in after her and parked between the convenience store and a car wash, thus situating themselves in a public area with "people coming back and forth." R., Vol. II at 31. The encounter took place

in the afternoon daylight. At no time during the encounter did the agents' two unmarked cars block Jones's vehicle.

When Jones came out of the convenience store, with a drink and snack in her hands, Bridge was sitting on the hood of his car. Although three more agents were nearby, either in or out of their cars, Bridge alone initiated contact with Jones. Addressing her by her first name, he showed his badge and said, "I'm a federal agent. Can I talk to you?" *Id.* at 9. Jones, initially nervous that a stranger used her first name, nevertheless said "yes" and approached Bridge. He showed her the package and asked if she knew what it was and whether she wanted it. She said "no" at first, but then quickly replied "yeah." *Id.* at 43.

For the sake of Jones's privacy, Bridge asked if he could speak with her in his car. She agreed. To ensure she was unarmed before they got in the car, Bridge asked if he could quickly frisk her and check her purse for weapons. She declined to let Bridge search her purse but agreed to a pat-down. Not wanting to take a chance that Jones could surprise the agents with a gun in her purse, Bridge asked Jones to leave her purse outside next to the car, right where she had placed her drink and snack during the pat-down. Jones got into the backseat of the car, on the right, and Bridge sat next to her, behind the driver's seat. One agent remained outside to make sure no one stole Jones's belongings. Two other agents got in the front seats, but did not participate in the conversation and mostly sat looking forward. Only Bridge spoke with Jones.

Inside the car, Bridge told Jones she was not under arrest, did not have to talk to him, and was free to leave. To that end, he motioned to her door, made sure it was unlocked, and told her so. Bridge then gave Jones the standard instruction that it was a crime to lie to a federal agent. At some point, after "establishing the basics of what [he] wanted to talk to her about," *id.* at 50, Bridge also noted the seriousness of the encounter by pointing out he could arrest Jones based on the iodine package. Throughout the whole conversation, however, Bridge's tone remained polite, calm, and conversational. And other than the police radio, which remained mostly silent during the conversation, nothing inside Bridge's car revealed it was a police vehicle.

After briefly talking about Jones's methamphetamine addiction, Bridge asked about the package. Jones explained she had ordered the iodine on Ebay, hoping to profit by reselling it to a man named Jetti. Jetti would then deliver the iodine to a methamphetamine producer. Bridge asked if Jones would help the agents get in touch with Jetti, and Jones agreed to cooperate to the extent she could. She provided a physical description of Jetti and said she would try to reach him to arrange a controlled delivery by the agents. She gave Bridge her cell phone and work phone numbers and provided the address where she was living at the time.

At some point during the conversation, Jones asked the agents to roll down her window, which they readily did. Bridge then again told Jones she was free to

terminate the encounter and leave.  She asked if she needed an attorney, and Bridge said it was up to her; Jones did not ask for one.  The agents also handed Jones her food, which she consumed while speaking with Bridge inside the car.

Agent Bridge managed to put Jones at ease, and after the conversation inside the car, she allowed the agents to search her purse and vehicle.  She said she had methamphetamine in her purse, which the agents quickly found along with other drug-use paraphernalia.

In its entirety, the gas station encounter lasted about 45 minutes to an hour.[1]  At no point did the agents brandish or unholster their concealed weapons, raise their voices, or in any other way indicate that Jones was required to submit to their authority.  She was never handcuffed, remained cooperative throughout the interview, and never asked to leave or said she did not want to talk to Agent Bridge.  After the search, Jones left in her own car.  She was not arrested that day.  Later, she was charged with possession of iodine knowing it would be used to manufacture methamphetamine.

## II.  Analysis

Prior to trial, Jones sought to suppress her statements to Agent Bridge as a violation of her *Miranda* rights, and the subsequently discovered evidence as a violation of her Fourth Amendment rights.  The district court denied Jones's

---

[1]  The record is unclear about the duration, but the parties agreed during oral argument that 45 to 60 minutes is a good estimate.

suppression motion on both grounds.  On appeal, she challenges only the *Miranda* issue.

### A.  *Legal Framework*

"In reviewing a district court's ruling on a motion to suppress, this court accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party," the government in this case.  *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000).  In our review, "[w]e are permitted to consider evidence introduced at the suppression hearing, as well as any evidence properly presented at trial."  *United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002).  The ultimate question of whether *Miranda* applies, however, is reviewed de novo.  *Hudson*, 210 F.3d at 1190.

Police officers need not administer *Miranda* warnings to everyone they question.  *Id.*  On its own terms, *Miranda* applies only to "custodial interrogation[s]."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Thus, "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'"  *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).  Because the government conceded Bridge's conversation with Jones was in the form of an interrogation, in resolving Jones's appeal we need only determine whether she was in custody.

Whether a person is in custody for *Miranda* purposes depends on the type of the encounter with police. Of the three types of police-citizen encounters—voluntary cooperation, an investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968), and a formal arrest—*Miranda*'s custody element is triggered only in situations associated with formal arrests. In other words, "[c]ase law is well established that a defendant is not in custody under either of the first two encounters and therefore *Miranda* warnings need not usually be given." *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993) (citing *Berkemer v. McCarthy*, 468 U.S. 420, 437–40 (1984)). "It is settled that the safeguards prescribed by *Miranda* become applicable [only when] a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Only then can we say a suspect is in custody.

Whether a suspect is in custody represents an objective determination. *See generally* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(c) (3d ed. 2007) [*Criminal Procedure*]. "We therefore must determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'" *Chee*, 514 F.3d at 1112 (quoting *Berkemer*, 468 U.S. at 442) (internal brackets and ellipsis removed). A reasonable person "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning

-8-

officer." *Hudson*, 210 F.3d at 1190 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998)).

"The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *Griffin*, 7 F.3d at 1518. We thus avoid hard line rules and instead allow several non-exhaustive factors to guide us. First, we consider "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* Second, we look at "the nature of questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* Finally, by using the following helpful guideposts, we check whether police dominate the encounter:

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.* at 1518–19. Although these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others.

### B. Application

We agree with the district court's conclusion that Jones was not in custody when she spoke with Agent Bridge.

*Suspect's Freedom to Leave*

The first factor weighs against a finding of custody. Shortly after Bridge initiated the encounter, he informed Jones she was not under arrest, did not have to talk to him, and could leave if she wanted. He specifically motioned to the door on Jones's side of the car and made sure it was unlocked. A bit later in the encounter, Bridge again told Jones she was free to leave. "That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004); *United States v. Brown*, 441 F.3d 1330, 1347–48 (11th Cir. 2006) (quoting *Czichray*, 378 F.3d at 826).

Our cases likewise establish the importance of telling suspects they are not under arrest and can terminate the encounter at will. For example, our recent decision in *Chee*, 514 F.3d at 1106, is instructive. In that case, the police asked Chee to visit the police station for questioning about a firearm Chee found in a car he had purchased at a government auction. *Id.* at 1110. The officers, however, intended to question Chee as a suspect of a sexual assault. *Id.* Chee was interrogated in a police-station office, with two officers in the room. *Id.* at 1111. But despite the location of the interview, we found the totality of the circumstances supported a finding of no custody when, during the interview, the suspect was told, among other things, that "he was not under arrest and was free to

leave." *Id.* at 1114; *cf. Griffin*, 7 F.3d at 1519 (concluding suspect to be in custody when she "was not told that she could refuse to answer the officer's questions or terminate the interview at any time and leave the . . . room").

Jones seeks to undercut the importance of Agent Bridge's statements—informing her she did not have to talk to him—by focusing on Bridge's comment he could arrest her based on the iodine package. She argues a reasonable person would not feel at liberty to terminate the encounter in light of two seemingly contradictory statements: (1) not under arrest, but (2) could be arrested. Although the question is a close one, we ultimately cannot agree that, on the totality of the facts here, the second statement undercuts the objective force of the first one.

In support of her argument, Jones relies on the fact pattern set forth in *United States v. DiGiacomo*, 579 F.2d 1211 (10th Cir. 1978). But *DiGiacomo* is quite different. There, in addition to being "told he could be arrested and jailed that evening," the suspect was given an explicit choice. *Id.* at 1214. The officers told DiGiacomo "he could choose between immediate arrest and 'voluntary' appearance at the Secret Service office the following morning." *Id.* Presented with a Hobson's choice, DiGiacomo, we concluded, was in custody and should have been given a *Miranda* warning. *Id.*

The facts here suggest a far less coercive environment. When Bridge told Jones he had enough to arrest her, he did not follow it up by saying anything to

-11-

indicate Jones had to cooperate, *or else*. Bridge did not, for example, say to Jones, "We can do this the easy way or the hard way. I think we have enough to arrest you now and let the courts figure it out, or you can talk to us and tell us what's going on and, you know, it might be better for you in the long run." *United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006) (internal ellipsis omitted). Construing Bridge's statement in the light most favorable to the government, we conclude Bridge was simply describing to Jones the seriousness of the encounter. To be sure, in saying he could arrest her, Bridge might have reminded Jones of the police's coercive powers. But "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). An unstated threat of coercion inherent in the officers' power to arrest is, taken alone, not enough.

Agent Bridge, in other words, was merely laying the groundwork by explaining to Jones why the agents were focusing their investigation on her purchase of iodine. Focus, however, does not mean custody. 2 *Criminal Procedure*, *supra*, § 6.6(a) ("The 'focus' approach [to deciding whether a suspect is in custody for *Miranda* purposes] was expressly rejected by the Court in *Beckwith v. United States*[, 425 U.S. 341, 347 (1976)]."). "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in

itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury v. California*, 511 U.S. 318, 325 (1994). Bridge's statement is in relevant respects very similar to telling a sexual assault suspect the police "had obtained DNA evidence," *Chee*, 514 F.3d at 1111 (no custody), or informing a burglary suspect his "fingerprints were found at the scene," *Mathiason*, 429 U.S. at 493 (no custody). A reasonable person in Jones's situation, we conclude, would understand the agents were not there to arrest her.

*Nature of Questioning*

Nothing in the record suggests Agent Bridge's conversation with Jones was marked by "prolonged accusatory questioning . . . likely to create a coercive environment from which an individual would not feel free to leave." *Griffin*, 7 F.3d at 1518. Bridge asked for Jones's cooperation in the agents' investigation of a methamphetamine production ring. Although focusing on Jones's iodine order, the agents obviously wanted to get to Jetti. She agreed to cooperate to the extent she could and to try to put the agents in touch with Jetti. We therefore cannot conclude Bridge's questioning, focusing primarily on someone other than Jones, would have made a reasonable person in Jones's shoes believe she was effectively under arrest. This factor thus also points away from a finding of custody.

*Lack of Police Domination*

Although some factors indicate possible police domination of the encounter, the totality of the circumstances suggests the opposite. Jones did encounter multiple agents, but she was not confronted by them simultaneously or aggressively, as was the suspect in *DiGiacomo*, for example. 579 F.2d at 1214. Only Agent Bridge spoke to her as she came out of the convenience store. In fact, Bridge was the only one to speak with her throughout the encounter.

And because the agents were in plain clothes, their guns concealed, we cannot necessarily conclude she immediately apprehended the presence of four agents. Two agents may have been still sitting in their unmarked car when Bridge first spoke to Jones. No guns were ever drawn (or even displayed). Except for a quick pat-down to ensure Jones would not bring a weapon into Bridge's car, the agents did not touch Jones. Indeed, Jones felt unthreatened enough to refuse consent to search her purse when asked by Bridge. Throughout the interview, Bridge's "tone remained calm and conversational." *Chee*, 514 F.3d at 1114. Overall, the facts of this case do not reveal a *threatening* presence of several officers.

Nor is the fact that most of the conversation took place inside Bridge's unmarked car dispositive of the custody issue. "Although the vehicle belonged to the agents, location alone does not compel the conclusion that a defendant is in custody, so long as his freedom was not curtailed to a degree similar to arrest."

*United States v. Lamy*, No. 07-2048, 2008 WL 852799, at *5 (10th Cir. Apr. 1, 2008). Police need not administer *Miranda* warnings simply "because the questioning is conducted in a certain place, i.e., a patrol car."[2] *Id.* (quoting *United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990)).

Similar to the suspect in *Lamy*, Jones was not ordered into Agent Bridge's car. Rather, she was politely asked to speak with the agents inside one of their vehicles, and she agreed. "This voluntary decision to accompany police argues against police domination." *Id.* (citing *United States v. Plumman*, 409 F.3d 919, 924 (8th Cir. 2005), and *United States v. Scheets*, 188 F.3d 829, 842 (7th Cir. 1999)). And it was perfectly sensible for Bridge to be cognizant of Jones's privacy and ask to speak inside his car, thus preventing passersby from learning of Jones's methamphetamine use. *Cf. United States v. Manbeck*, 744 F.2d 360, 379 (4th Cir. 1984) ("The reason for detaining [the suspect] in the patrol

---

[2] In two cases the Ninth Circuit found custody when the suspect was questioned inside a police car, but both are readily distinguishable and thus do not affect this case. The issue was "easily resolved" in *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993), where the suspect, unlike Jones, was handcuffed. The other case involved prolonged accusatory questioning inside "a closed FBI car . . . while police investigators were in and around [the suspect's] house." *United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982). As we have already explained, Jones, unlike Lee, did not face prolonged accusatory questioning. Moreover, *Lee* was "decided under an outmoded standard of review." *Czichray*, 378 F.3d at 826. "Under *Berkemer*, the question is *not* whether a reasonable person would believe he was not free to leave, [which was the question the *Lee* court asked,] but rather whether such a person would believe he was in police custody of the degree associated with formal arrest." 2 *Criminal Procedure*, *supra*, § 6.6(c).

car—specifically, the inclement weather—derogates from whatever coercive elements are otherwise normally attendant thereto.").  Thus, the circumstances surrounding Bridge's polite request to speak with Jones inside his vehicle do not support a finding of custody.

What is more, Bridge's car lacked virtually any official indicia that might normally intimidate a person placed into a fully equipped police vehicle—lights, radio, computer, cage, radar, etc.  Besides the police radio, which "wasn't even blaring" (and was inconspicuously located below the dashboard, between the front seats), R., Vol. II at 15, nothing inside the car revealed it to be a police unit.  Bridge's car alone, therefore, would not intimidate a reasonable person sitting inside.

Jones argues the agents situated themselves in a way calculated to intimidate.  While she sat next to Bridge in the backseat of his car, two agents sat in the front, and one remained outside next to Jones's purse and food.  Jones argues she was effectively surrounded by the agents.  But a more plausible assessment of the situation is that a reasonable person would have understood the two agents sitting in the front seats were there merely to listen to the interview, not to intimidate or block off possible exit points (lest we think a suspect is likely to leap from the back of the car into the front seat area and escape through the front doors).  Neither agent ever turned around to face Jones or spoke to her.  At most, while generally facing forward, these two agents may have turned their

upper bodies slightly towards the back of the car. And the agent who remained outside was apparently there to ensure no one walked off with Jones's purse and food. This was, after all, a public area with people going back and forth. On these facts, a reasonable person would not necessarily feel restrained by the agents' placement to a degree associated with formal arrest.

Jones further argues the agents were clearly in charge of the situation because they followed her from the earlier court appearance, waited for her to drop off her passenger, surrounded her at the gas station when Bridge first addressed her, and would not leave her alone when she said she was on her way to work. The record, construed in the light most favorable to the government, does not support these arguments.

First, Jones did not know the agents had followed her from the courthouse all the way to the gas station. We thus cannot attach any significance to this fact. Second, while Agent Bridge testified it was possible that one agent stood directly behind Jones when Bridge first addressed her, he was not sure of that. We construe this ambiguity against Jones. Finally, Bridge could not recall whether Jones had said she needed to get to work. We likewise construe this ambiguity against Jones.

Several additional factors suggest Jones at all times remained in control of the situation, and was thus not in custody. She at first refused to let the agents look in her purse. Indeed, the agents were able to search her purse and car only

-17-

after her later consent. When Jones asked that the agents roll down the window on her side of the car and give her the food, the agents promptly complied. Lastly, at the end of the interview, she freely left in her own car, a fact we found telling in *Chee*, 514 F.3d at 1114, where the suspect freely left after police-station interrogation. *See also* 2 *Criminal Procedure*, *supra*, § 6.6(c) (noting "the Supreme Court and the lower courts have relied upon the fact that the suspect was allowed to leave following the interrogation as strong evidence that the interrogation was not custodial" (internal footnotes omitted)). All in all, we cannot say the agents dominated the encounter.

\* \* \*

In sum, the totality of the circumstances convinces us Jones was not in custody for *Miranda* purposes. A reasonable person in her position would not feel her liberty was restricted to a degree associated with formal arrest. Bridge clearly told Jones she could freely walk away, his questioning focused mostly on Jetti's involvement, and the agents did not dominate the encounter to a degree associated with formal arrest. The conversation, as a result, was either a consensual encounter or, at most, a *Terry* stop. Neither though is enough to trigger the *Miranda* requirements.

### III.  Conclusion

Accordingly, we AFFIRM the district court's denial of Jones's motion to suppress her statements to Agent Bridge.