FILED
**United States Court of Appeals**
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 24, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LOUIS JEROME JONES,

Defendant - Appellant.

No. 23-6187
(D.C. No. 5:22-CR-00376-JD-1)
(W.D. Okla.)

**ORDER AND JUDGMENT***

Before **ROSSMAN**, **KELLY**, and **MURPHY**, Circuit Judges.

A jury convicted Appellant Louis Jerome Jones of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Before trial, Mr. Jones moved to dismiss the indictment, contending the statute of conviction violated the Second Amendment. He also filed a motion to suppress, arguing the warrantless search of his vehicle after a traffic stop

---

\* We granted Mr. Jones's unopposed motion to waive oral argument and ordered the matter submitted for disposition on the briefs pursuant to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

violated the Fourth Amendment. The district court denied both motions. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

# I

## A[1]

On August 3, 2022, members of the Oklahoma City Police Department (OCPD) participated in a surveillance operation of a gang-related funeral. The funeral took place in a rival gang's territory, and there was a heightened concern about retaliatory violence. Around 1:30 p.m., a surveillance detective reported over police radio that the driver of a black SUV—later identified as Mr. Jones—had just left the funeral and was likely armed with a handgun. Lt. Joshua Castlebury of the OCPD then "fell in behind" Mr. Jones's vehicle. RI.205. He observed the SUV straddle the center lane marker without first using a blinker and initiated a traffic stop. Lt. Castlebury turned on his police lights, and Mr. Jones immediately

---

[1] We take these facts from the district court's factual findings in the order denying Mr. Jones's suppression motion, testimony from the suppression hearing, and our review of the dash camera footage, body camera footage, and helicopter surveillance footage, all of which were admitted at the suppression hearing.

pulled over into a parking lot on the side of a frontage road. Detective Wes Cadena arrived on the scene in an unmarked vehicle shortly thereafter.

The events that followed the initial stop took place over the course of a few minutes. Lt. Castlebury conducted the traffic stop "as if there was a gun in the vehicle." RI.206. He approached the SUV from the rear, with one hand near his right hip on top of his holstered firearm. Before walking to the driver's-side door, he told Mr. Jones to lower his window. Mr. Jones complied. At the driver's-side window, Lt. Castlebury shook hands with Mr. Jones. Lt. Castlebury asked Mr. Jones for his license and registration. Mr. Jones produced his license, but he could not provide proof of insurance. Around the same time, Detective Cadena opened the back passenger door of the SUV.

Lt. Castlebury then asked Mr. Jones to step out of the vehicle—opening the driver's-side door for him—and Mr. Jones cooperated. Lt. Castlebury placed Mr. Jones's hands behind his back (interlocked but not handcuffed) and walked him to the police vehicle. He explained to Mr. Jones he was taking him back to the police vehicle to get his information, check for warrants, and give him a verbal warning. Officer Cadena followed behind.

Lt. Castlebury later testified that, at this point, Mr. Jones "granted" him "permission to search his pockets." RIII.36. The pat-down yielded "nothing of significance." RI.208. Lt. Castlebury asked Mr. Jones if there was a gun in the SUV, and "he said there wasn't." RIII.36. Lt. Castlebury then requested permission to search the SUV. According to Lt. Castlebury, Mr. Jones "said yeah" in response and "implied in the affirmative that I could search the vehicle." RIII.36. Mr. Jones, still uncuffed, was then assisted into the backseat of Lt. Castlebury's police car.

Mr. Jones and Lt. Castlebury (seated up front) discussed the funeral. By this time, five more law enforcement officers arrived. Lt. Castlebury directed one of them to search Mr. Jones's vehicle. Several minutes later, a handgun was found in the "center console area—behind a piece of plastic." RIII.94. When Mr. Jones heard the officers had located a gun, he responded, "[a]re you serious?" RI.210. Mr. Jones also denied owning the SUV.

Around the same time, Lt. Castlebury learned through the Department of Corrections website that Mr. Jones had a felony conviction. Lt. Castlebury then handcuffed Mr. Jones and attempted to read him his *Miranda* rights. Mr. Jones appeared to speak over Lt. Castlebury, repeating things like "this can't be happening to me," Supp.R.Video 1 at 00:00–04:30,

4

"I can't go to jail," and "they" will "kill me," Supp.R.Video 1 at 00:50–04:40; RI.211. After several attempts to give a *Miranda* warning, Lt. Castlebury stated "we're done" and moved Mr. Jones to the backseat of a different police vehicle on the scene—Officer Dakota Boxwell's car. Supp.R.Video 1 at 04:35.

Officer Boxwell joined Mr. Jones in the backseat, read him his *Miranda* rights, and asked Mr. Jones if he wanted to talk. Mr. Jones stated, "yes," and during that conversation, Mr. Jones "also admit[ted] to holding the firearm . . . a week and a half before [the killing that led to the funeral]." RI.214; *see also* Supp.R.Video 8 at 4:50–5:08. He also told Officer Boxwell, "I even gave you all consent to search the vehicle." RI.213.

## B

On September 6, 2022, a grand jury returned a one-count indictment charging Mr. Jones with being a felon in possession of a firearm in violation of § 922(g)(1). Mr. Jones moved to dismiss the indictment, arguing § 922(g)(1) was facially unconstitutional under the Second Amendment. The district court denied the motion.

Mr. Jones also moved to suppress, under the Fourth Amendment, the gun discovered during his traffic stop and the statements he made to law enforcement at the scene. Mr. Jones argued, first, "[t]he traffic stop was not

5

justified" at its inception because "[t]here was no observable traffic violation," RI.32–33; second, the "prolonged detention" did not "reasonably relate[] to the justification for" the initial stop, RI.34; and third, his consent to search the SUV was "involuntary," RI.36. The government opposed the motion, and the district court held a suppression hearing. OCPD Officers Castlebury and Boxwell testified. Officer Castlebury described the OCPD's surveillance of the funeral and the traffic stop. Officer Boxwell discussed the search of Mr. Jones's SUV and his subsequent interview of Mr. Jones. Both parties submitted video evidence capturing the traffic stop and search of the SUV.[2]

The district court denied Mr. Jones's motion in a written order. As we will discuss, the court made factual findings under Federal Rule of Criminal Procedure 12(d) and found "Lt. Castlebury's and Officer Boxwell's testimony

---

[2] In its order denying Mr. Jones's motion to suppress, the district court stated it "reviewed the videos in their entirety, which include Air One surveillance video of the traffic stop; audio and video footage from the body camera worn by Officer Boxwell; exterior dashcam footage from Lt. Castlebury's police car; and backseat audio and video footage from inside Lt. Castlebury's police car and Officer Boxwell's police car—all of which were recorded on August 3, 2022." RI.201. These videos are included in the record on appeal.

to be credible." RI.203 n.4. The case proceeded to a jury trial, and Mr. Jones was convicted as charged in the indictment. The district court imposed a sentence of 84 months imprisonment.

This timely appeal followed.

## II

Mr. Jones challenges his conviction, urging us to reverse the district court's denial of his motion to suppress and motion to dismiss the indictment. We take each in turn and affirm.

## A

Mr. Jones insists the district court should have suppressed the firearm found in the SUV because he did not "freely and voluntarily consent[] to a search of the vehicle."[3] RI.224. According to Mr. Jones, the record shows his "consent was not voluntary, but obtained in violation of the Fourth Amendment." Op. Br. at 15.

The Fourth Amendment protects against unreasonable searches of "persons, houses, papers, and effects." U.S. Const. amend. IV. A vehicle is

---

[3] Mr. Jones does not reprise on appeal any challenge to the initial stop or the length of detention.

7

an "effect" protected by the Fourth Amendment. *Byrd* v. *United States*, 584 U.S. 395, 403 (2018). "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable.'" *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz* v. *United States*, 389 U.S. 347, 357 (1967)). And "evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions." *United States* v. *Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). "Voluntary consent to search is one such exception." *Id.* (citing *United States* v. *Silva-Arzeta*, 602 F.3d 1208, 1213 (10th Cir. 2010)); *see also Schneckloth*, 412 U.S. at 219 (describing "a search that is conducted pursuant to consent" as a "well settled" and "specifically established exception[] to the requirements of both a warrant and probable cause"). "[A] vehicle may be searched if a person in control of the vehicle has given his voluntary consent to the search." *United States* v. *Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (citing *United States* v. *Santurio,* 29 F.3d 550, 552 (10th Cir.1994)). "The government has the burden of proving valid consent to a warrantless search." *United States* v. *Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (citing *United States* v. *Cody,* 7 F.3d 1523, 1526 (10th Cir.1993)).

8

When assessing the voluntariness of consent, we have used a "two-part test": "First, the government must proffer clear and positive testimony that consent was unequivocal and specific and freely given. [Second], the government must prove that this consent was given without implied or express duress or coercion." *Zubia-Melendez*, 263 F.3d at 1162 (internal quotation marks and citation omitted). Voluntariness of consent is "determin[ed] based upon the totality of the circumstances." *United States* v. *Sawyer*, 441 F.3d 890, 894 (10th Cir. 2006). As the Supreme Court has instructed, the voluntariness inquiry does not "turn[] on the presence or absence of a single controlling criterion." *Schneckloth*, 412 U.S. at 226. "Rather[,] it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Id.* at 233.

"Whether consent was voluntarily given is a question of fact we review for clear error." *Harrison*, 639 F.3d at 1277; *United States* v. *Latorre*, 893 F.3d 744, 756 (10th Cir. 2018) ("[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact . . . ." (alteration in original) (quoting *Schneckloth*, 412 U.S. at 227)). "A district court's factual finding is clearly

erroneous when it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *United States* v. *Tafoya*, 557 F.3d 1121, 1126 (10th Cir. 2009) (internal quotation marks and citation omitted). But "[t]he ultimate question of whether a search . . . was reasonable under the Fourth Amendment is a question of law that we review de novo." *United States* v. *Oliver*, 363 F.3d 1061, 1065 (10th Cir. 2004).

Applying these principles here, we discern no error. As we will explain, the record confirms the search of the SUV was constitutionally permissible because it was conducted pursuant to Mr. Jones's valid consent.

**1**

In its written order denying the suppression motion, the district court began with a detailed recitation of its factual findings.[4] As relevant here, the district court first found "Mr. Jones consented to a search of the

---

[4] The district court noted "Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to 'state its essential findings on the record' when deciding a motion that involves factual issues. These findings of fact shall serve as the Court's essential findings for purposes of Rule 12(d)." RI.202 n.3 (quoting Fed. R. Civ. P. 12(d)).

10

vehicle."[5] RI.208. The district court then found, "[n]othing from the video or from the testimony suggests that Mr. Jones'[s] consent was the product of implied or express duress or coercion." RI.225. Relying on the dashcam footage, the district court determined Mr. Jones and Lt. Castlebury had a "cordial exchange." RI.224. The court also observed Mr. Jones, though "within earshot" when Lt. Castlebury ordered the search of the vehicle, did not object or revoke his consent. RI.224. Based on the testimony of the officers, the district court further found Mr. Jones was "coherent and not under the influence of alcohol or drugs." RI.225. And as to any signs of express coercion, the district court found "[n]either Lt. Castlebury nor the officers conducting the search showed any signs of force[, and] they did not

---

[5] As the government correctly observes, "[Mr. Jones] does not challenge the district court's finding that he provided consent." Ans. Br. at 13. Nor could he. Lt. Castlebury testified he asked Mr. Jones if he could search the vehicle, and Mr. Jones agreed. To be sure, the conversation between Mr. Jones and Lt. Castlebury is not captured on audio. But the district court acknowledged as much and found Lt. Castlebury's testimony at the suppression hearing was credible. Importantly, Mr. Jones's own statement—audible in the video evidence—confirms he actually provided consent. He told Officer Boxwell, "I even gave you all consent to search the vehicle." RI.213. The district court relied on this evidence to find, "Mr. Jones at one point acknowledged that he had consented to the officers searching his vehicle." RI.213.

display their weapons." RI.225. Finally, the district court considered and rejected Mr. Jones's argument that "he was not in a position to give voluntary consent to search because he was escorted back to the police car with his fingers interlaced and hands behind his back." RI.225. According to the district court, "[t]he video shows that Mr. Jones remained unhandcuffed, and that Lt. Castlebury escorted him using only one hand while Detective Cadena followed behind without physically touching Mr. Jones." RI.225.

Mr. Jones does not argue that the district court's factual findings are clearly erroneous. Rather, he insists "the district court's order does not demonstrate it actually *did* consider all factors in the record, mitigating and aggravating, as required in any totality of the circumstances evaluation." Reply Br. at 1. We are not persuaded.

We have acknowledged factors relevant to the voluntariness inquiry "include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons." *Sawyer*, 441 F.3d at 895; *see also United States* v. *Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012). We also

12

have said that "[w]hether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent" are "factors to consider in determining whether consent given was voluntary under the totality of the circumstances." *Sawyer*, 441 F.3d at 895 (citations omitted).

The district court focused precisely on the sort of facts our precedent recognizes as relevant to determining whether consent was the product of express or implied coercion. *See United States* v. *Dozal*, 173 F.3d 787, 796 (10th Cir. 1999) ("The proper inquiry centers on whether the defendant suffered, inter alia, physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery.") (internal quotation marks and citation omitted); *United States* v. *Pena-Sarabia*, 297 F.3d 983, 987 (10th Cir. 2002) (concluding consent was voluntary when "[t]he police did not draw or display their weapons" or make "threats or promises, or induce[] consent through trickery"); *United States* v. *Guillen*, 995 F.3d 1095, 1105 (10th Cir. 2021) (concluding consent was voluntary when "[t]he agents spoke in a casual, rather than an aggressive, manner"). And the record—consisting of the officers' suppression hearing testimony, dash camera footage, body camera footage, and helicopter surveillance

13

footage—amply provides a "rational basis for the district court's finding" that Mr. Jones voluntarily consented. *United States* v. *Kimoana*, 383 F.3d 1215, 1225 (10th Cir. 2004) (holding "if there is any rational basis for the district court's finding on [voluntariness of consent, which is a] fact-based inquiry, we must affirm") (internal quotation marks and citation omitted). We thus discern no error—let alone clear error—in the district court's determination.

## 2

Resisting this conclusion, Mr. Jones contends "[t]he atmosphere [of his stop] was . . . coercive in totality." Op. Br. 20. Again, we are not persuaded.

*First*, Mr. Jones insists coercion is present on this record because Lt. Castlebury had his hand on his gun holster as he approached the SUV. For one thing, the record is far from clear Mr. Jones could have seen Lt. Castlebury's hand placement. But even assuming Mr. Jones's view of the record is permissible, we cannot say the district court's finding that the officers showed no force and did not display their weapons is clearly erroneous. *See United States* v. *Craine*, 995 F.3d 1139, 1157 (10th Cir. 2021) ("[W]here there are two permissible views of the evidence, the factfinder's

14

choice between them cannot be clearly erroneous.") (quoting *Anderson* v. *City of Bessemer City*, 470 U.S. 564, 574, (1985)).

*Second*, Mr. Jones insists his hands-on escort to Lt. Castlebury's police vehicle shows coercion. The district court considered and rejected this argument, and so do we. We have previously explained, in considering whether consent to search was voluntarily given, that "simply . . . being arrested and handcuffed" does not show coercion. *Silva-Arzeta*, 602 F.3d at 1215. And here, Mr. Jones was not handcuffed and had not yet been arrested. Similarly, we cannot say that the presence of more than one officer on the scene establishes coercion, especially here, where the record shows the officers did not assert their presence in a threatening way. *See id.*; *see also United States* v. *Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007) (explaining that "[w]hile the *threatening* presence of multiple officers is a factor in determining whether an individual's consent is voluntary," that factor did not indicate coercion because the additional officer's presence was not "*coercive or threatening*" and the officer "was standing on the other side of the vehicle" (emphasis added) (citation omitted)).

*Third*, Mr. Jones contends he was more susceptible to coercion because of his emotional state following the funeral. As the government

15

admits, "[o]ne can reasonably infer that, having just come from a funeral, Mr. Jones would be downtrodden." Ans. Br. at 22. Even assuming Mr. Jones was emotional, his subjective state of mind does not support his argument that consent was involuntary under these circumstances. We cannot infer coercion on this record, where no evidence suggests the officers exploited Mr. Jones's vulnerability to garner consent. *See United States* v. *Sims*, 428 F.3d 945, 953 (10th Cir. 2005) ("[T]he district court found no evidence that the police had attempted to exploit any of his vulnerabilities."); *cf. United States* v. *Hill*, 199 F.3d 1143, 1149 (10th Cir. 1999) (stating in the context of our Fourth Amendment seizure analysis "that the particular personal traits or subjective state of mind of the defendant are irrelevant . . . other than to the extent that they *may have been known to the officer and influenced his conduct*." (emphasis added) (quoting *United States* v. *Little*, 18 F.3d 1499, 1505 (10th Cir. 1994))).

*Fourth*, Mr. Jones argues the pretextual nature of the stop suggests coercion. Recall, as the district court acknowledged, Lt. Castlebury "readily conceded" at the suppression hearing the stop "was a pretextual traffic stop." RI.205; RIII.79 (Lt. Castlebury testifying the stop was "an attempt" to "investigate the gun offense" "based off information that [Mr. Jones] was

16

a gang member, and there[] [was] a gun in the vehicle"). But the Fourth Amendment inquiry is objective—focusing on the "coercive effect of police *conduct*" and not an officer's subjective motive. *Little*, 18 F.3d at 1503 (emphasis added) (quoting *Michigan* v. *Chesternut*, 486 U.S. 567, 573 (1988)); *see United States* v. *Spivey*, 861 F.3d 1207, 1215 (11th Cir. 2017) ("The subjective motivation of the officers is irrelevant."); *Illinois* v. *Perkins*, 496 U.S. 292, 296 (1990) ("Coercion is determined from the perspective of the suspect." (citing *Rhode Island* v. *Innis,* 446 U.S. 291, 301, (1980)).

*Finally*, Mr. Jones says he was subject to an overall "atmosphere" of implicit coercion, which rendered his consent involuntary. Op. Br. at 20. We cannot agree. On the record before us, any power imbalance "inherent" in citizen-law enforcement encounters does not amount to coercion. *United States* v. *Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) (acknowledging that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it" but noting such "[a]n unstated threat of coercion inherent in the officers' power to arrest is, taken alone, not enough" for a finding of Fourth Amendment custody (first alteration in original) (first quoting *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977))); *Silva-Arzeta*, 602

17

F.3d at 1215 (stating police conduct that "added no coercion beyond that inherent in his arrest" did not render the consent coerced).[6]

The ultimate question for purposes of the Fourth Amendment is "whether the consent was the product of an 'essentially free and unconstrained choice by [the] maker.'" *Sawyer*, 441 F.3d at 895 (alteration in original) (quoting *Schneckloth*, 412 U.S. at 225, 227). The district court concluded, "Mr. Jones'[s] consent was freely and voluntarily given in line with the required legal standard and based upon the totality of the circumstances." RI.226. We see no reason to disagree. We affirm the denial of Mr. Jones's motion to suppress.

---

[6] Mr. Jones also makes passing reference to the fact "a police helicopter whirred overhead." Op. Br. at 20. The district court acknowledged the helicopter during its factual findings to explain the presence of additional surveillance. But the district court did not rely on the presence of the helicopter—or discuss whether it was audible or visible to Mr. Jones—in holding that "Mr. Jones freely and voluntarily consented to the search." RI.224. On this record, we cannot say the presence of a helicopter on the scene of the traffic stop gives us "a definite and firm conviction that a mistake has been made" with regard to the district court's ultimate finding of voluntariness. *United States* v. *Tafoya*, 557 F.3d 1121, 1126 (10th Cir. 2009) (internal quotation marks and citation omitted).

**B**

Mr. Jones next argues the district court erred in denying his motion to dismiss the indictment. In the district court, Mr. Jones argued the charging statute—18 U.S.C. § 922(g)(1)—violated the Second Amendment. He contended § 922(g)(1) was facially unconstitutional because "[f]elon-disarmament laws, which did not appear in the United States until the 20th century, were unknown to the generation that ratified the Second Amendment." RI.21. The district denied Mr. Jones's motion. The district court observed "the Tenth Circuit has consistently upheld the constitutionality of § 922(g) generally." RI.190 (citing *United States* v. *McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)).[7] But the district court also

---

[7] The court also relied on the following cases for this point in addition to *United States* v. *McCane*, 573 F.3d 1037, 1047 (10th Cir.2009): *United States* v. *Griffith*, 928 F.3d 855, 870–71 (10th Cir. 2019) (rejecting the defendant's Second Amendment challenge to § 922(g)(1) and relying on *District of Columbia* v. *Heller*, 554 U.S. 570, 626 (2008), where "the Supreme Court reiterated that the Second Amendment does not affect the longstanding prohibition against felons possessing firearms"); *United States* v. *Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012) (concluding "§ 922(g)(5) withstands [the defendant's] Second Amendment" challenge); *United States* v. *Molina*, 484 F. App'x 276, 285–86 (10th Cir. 2012) (unpublished) (relying on *McCane* to reject a Second Amendment challenge to § 922(g)(1)); *United States* v. *Richard*, 350 F. App'x 252, 260 (10th Cir. 2009) (unpublished) (same, regarding a Second Amendment challenge to §

acknowledged those cases predated *New York State Rifle & Pistol Association, Inc.* v. *Bruen*, 597 U.S. 1 (2022). Under *Bruen*'s framework, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. The district court reasoned that, under *Bruen*, "Mr. Jones'[s] conduct is presumptively protected under the Second Amendment," but the government carried its burden to show "§ 922(g)(1) is consistent with this Nation's tradition of firearm regulation." RI.196.

On appeal, Mr. Jones contends "the government cannot and has not met its burden to prove that section 922(g)(1) meets *Bruen*'s requirements." Op. Br. at 21. We review Mr. Jones's constitutional challenge to § 922(g)(1) de novo. *See United States* v. *Berres*, 777 F.3d 1083, 1087 (10th Cir. 2015) ("We review the constitutionality of a statute de novo."); *United States* v. *Wells*, 873 F.3d 1241, 1253 (10th Cir. 2017) (noting that legal issues

---

922(g)(3)); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (unpublished) (same, regarding a Second Amendment challenge to § 922(g)(9)).

20

"embedded" in denial of motion to dismiss indictment "are reviewed de novo"). Mr. Jones concedes his appellate claim is "foreclosed at this time." Op. Br. at 22. He appropriately acknowledges that, after *Bruen*, we reaffirmed our decision in *McCane* "uphold[ing] the constitutionality of the federal ban on felons' possession of firearms." Op. Br. 22 (quoting *Vincent v. Garland*, 80 F.4th 1197, 1199 ("*Vincent I*") (10th Cir. 2023) (alteration in original)).

After *United States* v. *Rahimi*, 602 U.S. 680 (2024), the Supreme Court vacated our decision in *Vincent I* and remanded. *Vincent* v. *Garland*, 144 S. Ct. 2708, 2708–09 (2024) (mem.). Recently, we "freshly considered" whether § 922(g)(1) violates the Second Amendment and "conclud[ed] that *Rahimi* doesn't undermine the panel's earlier reasoning or result." *Vincent* v. *Bondi*, --- F.4th ----, 2025 WL 453999, at *1 (10th Cir. Feb. 11, 2025). We thus held "*McCane* remains binding," and we "readopt[ed] our prior opinion" in *Vincent I. Id.* at *2. Given these developments, and because "we are bound to follow" this precedent, *United States* v. *Swan*, 91 F.4th 1052, 1059 n.7 (10th Cir. 2024), we must reject Mr. Jones's Second Amendment challenge to § 922(g)(1). We therefore affirm the district court's denial of Mr. Jones's motion to dismiss the indictment.

21

## III

Mr. Jones's conviction is **AFFIRMED**.

Entered for the Court

Veronica S. Rossman
Circuit Judge